UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------x

TANYA GAMBLE,

               Plaintiff,

 -v-                                                No.  20-CV-10388-LTS

FIELDSTON LODGE NURSING AND
REHABILITATION CENTER and XYZ
CORP. 1-10,

               Defendants.

-------------------------------------------------------x

<u>MEMORANDUM ORDER</u>

        Plaintiff Tanya Gamble ("Plaintiff" or "Ms. Gamble") brought this action against defendants Fieldston Lodge Nursing and Rehabilitation Center and XYZ Corp. 1-10 (together, "Fieldston" or "Defendants"), asserting claims of sexual orientation discrimination, retaliation, and hostile work environment, all in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. section 2000e <u>et</u> <u>seq.</u> ("Title VII"), and all arising out of Plaintiff's employment with Fieldston between 2013 and August 2019.  The Court previously granted Fieldston's motion for judgment on the pleadings as to Plaintiff's third cause of action for hostile work environment. (Docket entry no. 33.)  The Court has jurisdiction of this action pursuant to 28 U.S.C. section 1331.

        Fieldston now moves, pursuant to Federal Rule of Civil Procedure 56(a), for summary judgment dismissing the two remaining claims of sexual orientation discrimination and retaliation.  (Docket entry no. 42.)  The Court has reviewed the parties' submissions thoroughly and, for the following reasons, Fieldston's motion is denied.

BACKGROUND[1]

Ms. Gamble is a lesbian woman who was employed at Fieldston, a rehabilitation and nursing facility in the Bronx, New York, as a Certified Nursing Assistant ("CNA") from May 2013 to August 2019. (Pl. 56.1 St. ¶¶ 1, 7, 72.) As a CNA, Ms. Gamble scheduled outside medical appointments for Fieldston residents and arranged their transfers out of and back to Fieldston, ensured floors were properly staffed, and assisted with payroll. (Id. ¶ 9.) From 2013 to 2015, in addition to her work as a CNA, Ms. Gamble also performed the duties of a Wound Round Aide (cleaning wounds and wrapping dressings) and a Rehab Assistant (ambulating stroke patients and affixing prosthetics). (Docket entry no. 49-16 ("Pl. Dep. Tr.") 20:19-25, 158:16-159:6.) Ms. Gamble also performed the duties of a Staffing Coordinator from September 2017 to January 2018, and then again from the end of 2018 until August 2019, which involved, among other things, using software to manage employee schedules and ensure that Fieldston was sufficiently staffed. (Pl. 56.1 St. ¶¶ 7, 11; Pl. Dep. Tr. 26:13-24.)

Plaintiff's Sexual Orientation

For several years, Ms. Gamble's sexual orientation was not known by her colleagues at Fieldston. (Pl. 56.1 St. ¶ 72.) On May 21, 2019, however, Plaintiff posted a video of her May 18, 2019, engagement to her same sex partner on Facebook. (Id. ¶¶ 73-74.) When she returned to work the following day, Plaintiff was approached by Carol Roundtree, a receptionist at Fieldston, who told her that several employees were sharing and discussing the

---

[1] The following facts are undisputed unless otherwise noted. The facts presented or recited as undisputed are drawn from the parties' statements pursuant to S.D.N.Y. Local Civil Rule 56.1, or from evidence as to which there is no contrary, non-conclusory factual proffer. Citations to Defendants' Local Civil Rule 56.1 Statement (docket entry no. 46 ("Def. 56.1 St.")) or Plaintiff's Rule 56.1 Statement (docket entry no. 51 ("Pl. 56.1 St.")) incorporate by reference citations to the underlying evidentiary submissions.

engagement video.  (Pl. Dep. Tr. 72:7-73:17.)  Plaintiff believes that Fieldston employees learned of the engagement video through David Perez, Fieldston's Director of Recreation, and the only employee who was friends with Plaintiff on Facebook.  (Id. 75:9-76:3.)  Though Ms. Gamble does not recall whether Ms. Roundtree commented on her sexual orientation, she states that "the entire conversation [with Ms. Roundtree] made [her] very uncomfortable."  (Id. 128:13-15.)  Soon afterward, certain of Plaintiff's co-workers made comments to Plaintiff about her sexual orientation: (1) Yvette, a Fieldston housekeeper, congratulated Plaintiff on her engagement, said, "I didn't know you were like that," and asked whether she would be attending the upcoming gay pride parade in June; (2) Carmen, another Fieldston housekeeper, told Plaintiff, "You don't look gay"; and (3) Mr. Perez also expressed to Plaintiff, "I didn't know you were like that," and remarked, "Get it girl," and snapped his fingers.  (Id. 122:23-25, 123:8-10, 125:23-25, 125:6-15.)

Ms. Gamble also experienced a marked shift in how colleagues treated her following the circulation of her engagement video, and she relayed her concerns to Jennifer Tirado, who oversaw Fieldston's Human Resources:

> I told her exactly what was going on as far as the comments we just mentioned from Yvette and from Carmen. I told her about Ms. Russell and I told her how when I got off the elevator, everybody would stop talking. I expressed to her how the lady in rehab stopped speaking to me altogether. She would just walk by me like I was invisible. I never did anything to her. So I didn't have any problems there. I worked there over six years. I've never been written up. I never had no problems until my video came out.

(Id. 132:21-133:9.)  Ms. Gamble, who was friendly with Ms. Tirado, claims she spoke to her about this mistreatment "every other day" from the time she returned to the office following her engagement in May 2019 until her eventual termination in August of that year.  (Id. 133:10-20.) When asked in her deposition what Ms. Tirado would say in response to these concerns, Ms.

Gamble expressed that Ms. Tirado said, "Don't worry about these mother fu[**]ers in the facility." (Id. 134:12-18.) Plaintiff claims that she told Ms. Tirado, "[t]he staff needs to be in-serviced on how to treat people," and that Ms. Tirado laughed in response. (Id. 136:5-10.) Ms. Gamble also spoke with May Zamudio, Fieldston's Assistant Director of Nursing, with the hope that she would "take action." (Id. 137:15-20.) While Plaintiff did not disclose specific employee comments to Ms. Zamudio, she discussed the dissemination of the engagement video, and "what [she was] going through," expressing that "I hope you don't look at me any differently." (Id. 137:6-10.) In response, Ms. Zamudio hugged and congratulated her and told her not to "worry about these people." (Id. 137:10-12.) Afterward, Ms. Zamudio "would just come back and forth in the office periodically and check on [Ms. Gamble] and tell [her] to keep [her] head up." (Id. 138:2-4.) In another example of a shift in treatment, Ms. Gamble cites the conduct of Eli Knoll, Fieldston's Executive Administrator. She claims that, prior to May 2019, Administrator Knoll would often speak to Ms. Gamble when leaving work "early on Fridays because of his religion" (id. 130:24-131:4), and share stories about, among other things, his wife, children, and his first apartment (id. 190:15-22). After her engagement video surfaced, Ms. Gamble asserts, Mr. Knoll stopped speaking with her entirely (id. 130:15-18), "except when he had to give [Plaintiff her] paycheck" (id. 130:12-14).

        Ms. Gamble remarked in her deposition that she did not "want [her engagement video] to get out because [she knows] how people who are gay have been treated in that facility before." (Id. 121:22-24.) In support of that account, she stated, among other things, that: (1) she once heard Administrator Knoll say the word "fa[**]ot" in a conference room with other Fieldston employees and that, when she walked in, those in the room "stopped talking" (id. 19:2-21); and (2) several Fieldston employees, including Administrator Knoll and Ms. Tirado, made

jokes and gestures about an employee believed to be homosexual, including by mocking how he walked.  (Id. 143:5-144:14.)

Plaintiff's Employment Status and Termination

The parties disagree as to whether Ms. Gamble was considered for a promotion to Staffing Coordinator—a role that she had previously covered on a fill-in basis between September 2017 and January 2018, and again from end of 2018 until August 2019.  Ms. Gamble claims that, before and after her engagement, she verbally accepted oral offers to take on the Staffing Coordinator position that were extended by multiple individuals she believes had the authority to hire for the role, including Ms. Zamudio and Director of Nursing Roberto Reyes. (Pl. 56.1 St. ¶ 14.)  In her complaint, she alleged that Fieldston "retracted" these offers because of her sexual orientation.  (Docket entry no. 1 ("Compl.") ¶ 52.)  During her deposition, Ms. Gamble was unable to explain the use of the term "retracted" in her Complaint, and stated instead that, "[w]ell, obviously [the offer] was retracted, they fired me.  But no, no one verbally came to me and said no, you're not going to get the Staffing Coordinator job.  No conversation ever took place."  (Pl. Dep. Tr. 100:19-25, 101:2-4.)

In response, Administrator Knoll proffers in his sworn declarations that (1) no actual offer was ever made to Plaintiff, (2) none of the individuals that Plaintiff mentions had the authority to offer Plaintiff or anyone else the Staffing Coordinator position, (3) no one approached him regarding the possibility of her taking on the position, and (4) he considered (and later hired for a brief period) for the role an external candidate named Alexis Pringle, who submitted an Acknowledge and Consent Form for Fingerprinting and Disclosure of Criminal Background History Information, dated May 14, 2019, prior to Plaintiff's engagement.[2]  (Docket

---

[2]  At her deposition, Plaintiff was shown a public job advertisement for the Staffing Coordinator position, dated March 4, 2019, and was asked if she knew why the position

entry no. 44 ("Knoll First Decl.") ¶¶ 8-10; docket entry no. 53 ("Knoll Second Decl.") ¶¶ 3-4.) Plaintiff concedes that she did not receive an offer letter for the position and that she was neither provided with a job description nor interviewed for the role. (Pl. 56.1 St. ¶¶ 14-17.)

In mid-to-late August, approximately three months after the disclosure of the engagement video in late May, Administrator Knoll called Ms. Gamble into his office and terminated her employment. (Pl. 56.1 St. ¶ 27.) The parties dispute numerous facts relating to the reasons for Ms. Gamble's termination. Administrator Knoll proffers in a sworn declaration that he was not aware of Plaintiff's sexual orientation "at the time she was hired, during her employment, or at the time of her termination," that he has not seen her engagement video, that no Fieldston employees ever discussed Plaintiff's sexual orientation with him, and that he was not aware of her alleged complaints about employees making comments about her sexual orientation. ("Knoll First Decl." ¶¶ 13, 21-22.) As to the reason for Ms. Gamble's termination, Administrator Knoll asserts that: (1) Plaintiff was a part-time, administrative per diem employee; (2) "throughout 2018 and 2019, Plaintiff's workload continued to decline because Fieldston did not have sufficient administrative fill-in work for her to perform, even with her part-time schedule"; and (3), as a result, he discontinued Plaintiff's employment "due to the lack of available work." (Id. ¶¶ 17-18.) He further states that, since Plaintiff's termination, "Fieldston's full-time employees have been able to adequately handle all administrative tasks." (Id. ¶ 20.)

Ms. Gamble disputes Administrator Knoll's proffered lack of knowledge about her sexual orientation, and states that his and Ms. Tirado's offices are adjacent, and that "he sits

---

would be posted after she had been offered the position. (Pl. Dep. Tr. 114:17-25.) In response, Ms. Gamble stated, "Well, I can't tell you why Eli does what he does, but it has been my experience that even if a job is promised to an in-house employee, they have the right to still post it to give everybody a fair share, a fair shot at the job." (Id. 114:24-115:5.) The job announcement is not attached to the parties' submissions in connection with the instant motion.

in her office all day and they talk." (Pl. Dep. Tr. 193:23-25.) She also claims that she was a full-time employee, working four days per work, and asserts that she had "plenty of work left on [her] desk" the day she was terminated. (Pl. Dep. Tr. 160:19-25.) Ms. Gamble points to a "check summary," which indicates that her weekly pay—based on hours worked—remained relatively consistent throughout all of 2019 leading up to her termination in August. (See docket entry no. 49-9 ("Check Summary") at 1.)

## DISCUSSION

Fieldston moves for summary judgment dismissing Plaintiff's remaining two Title VII claims for sexual orientation discrimination and retaliation. Summary judgment is to be granted in favor of a moving party if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A fact is considered material if it "might affect the outcome of the suit under the governing law," and an issue of fact is a genuine one where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Holtz v. Rockefeller & Co. Inc., 258 F.3d 62, 69 (2d Cir. 2001) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). To defeat a summary judgment motion, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Caladora v. Calabrese, 298 F.3d 156, 160 (2d Cir. 2002) (citation omitted). The nonmoving party "may not rely on mere conclusory allegations nor speculation, but instead must offer some hard evidence showing that its version of the events is not wholly fanciful." Golden Pac. Bancorp v. FDIC, 375 F.3d 196, 200 (2d Cir. 2004) (citation omitted).

In determining whether there is a genuine dispute as to a material fact, the Court is "required to resolve all ambiguities and draw all permissible factual inferences in favor of the

party against whom summary judgment is sought." Johnson v. Killian, 680 F.3d 234, 236 (2d Cir. 2012) (quoting Terry v. Ashcroft, 336 F.3d 128, 137 (2d Cir. 2003)).  In employment discrimination cases, where direct evidence of intentional discrimination is rare, "affidavits and depositions must be carefully scrutinized for circumstantial proof" of discrimination.  Turner v. NYU Hosps. Ctr., 784 F. Supp. 2d 266, 275 (S.D.N.Y. 2011) (citing Gallo v. Prudential Residential Servs., Ltd., 22 F.3d 1219, 1224 (2d Cir. 1994)), aff'd, 470 F. App'x 20 (2d Cir. 2012).

The Court addresses each of Ms. Gamble's two claims in turn.

Title VII Sexual Orientation Discrimination

To establish a prima facie case of discrimination under Title VII, Ms. Gamble must show that: (1) she belonged to a protected class; (2) she was qualified for the position she held; (3) she suffered an adverse employment action; and (4) the adverse employment action occurred under circumstances giving rise to an inference of discriminatory intent.  Brown v. City of Syracuse, 673 F.3d 141, 150 (2d Cir. 2012) (citing Holcomb v. Iona Coll., 521 F.3d 130, 137 (2d Cir. 2008)).  "A plaintiff's burden of establishing a prima facie case is de minimis."  Abdu-Brisson v. Delta Air Lines, Inc., 239 F.3d 456, 467 (2d Cir. 2001).

In evaluating Title VII discrimination claims where the plaintiff lacks direct evidence of discriminatory conduct, the Court applies the familiar three-step burden shifting framework established in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).  Under that framework, after a plaintiff establishes a prima facie case of discrimination, the burden shifts to the employer to come forward with a legitimate, nondiscriminatory reason for the adverse employment action.  See Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 142 (2000). The employer need not prove by a preponderance of evidence that the challenged action was not the product of discrimination, "but may simply 'present clear and specific reasons for the

action.'"  Gibbs v. Consolidated Edison Co. of New York, Inc., 714 F. Supp. 85, 89 (S.D.N.Y. 1989) (quoting Neale v. Dillon, 534 F. Supp. 1381, 1387 (E.D.N.Y. 1982), aff'd, 714 F.2d 116 (2d Cir. 1982)).

At the third step of the McDonnell Douglas framework, the Court's task is to "examin[e] the entire record," using a case-specific approach, "to determine whether the plaintiff could satisfy his ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff."  Schnabel v. Abramson, 232 F.3d 83, 90 (2d Cir. 2000) (internal quotation marks omitted).  The Second Circuit has explained that "there are two distinct ways for a plaintiff to prevail—either by proving that a discriminatory motive, more likely than not, motivated the defendants or by proving both that the reasons given by the defendants are not true and that discrimination is the real reason for the actions."  Gordon v. N.Y. City Bd. of Educ., 232 F.3d 111, 117 (2d Cir. 2000) (internal quotation marks omitted).

Fieldston only challenges the fourth and final element of Plaintiff's prima facie case—arguing that she has not shown that her termination "occurred under circumstances giving rise to an inference of discriminatory intent" because Administrator Knoll lacked knowledge of her sexual orientation.  (Docket entry no. 45 ("Def Mem.") at 13-14); see also Brown, 673 F.3d at 150.  Plaintiff's burden at the prima facie stage is, however, "de minimis."  Abdu-Brisson, 239 F.3d at 467.  Indeed, temporal proximity alone can be sufficient to show an inference of discrimination at the prima facie stage.  Washington v. NYC Madison Ave. Med. P.C., No. 20-CV-03446-LTS-SN, 2023 WL 4980215, at *4 (S.D.N.Y. Aug. 3, 2023) (collecting cases).  Here, approximately three months transpired between the disclosure of Plaintiff's engagement video in late May and her termination in mid-to-late August, which the Court finds is adequate to support the causal inference at the first step of the burden-shifting framework.

While Fieldston is correct to note that an employer's knowledge of the employee's protected status is part and parcel of establishing a status-based discrimination claim, its reliance on Woodman v. WWOR-TV, Inc., 411 F.3d 69 (2d Cir. 2005), is misplaced. (Def. Mem. at 14.)  There, the Second Circuit acknowledged that "courts require the plaintiff to adduce some evidence of knowledge to support an inference of intentional discrimination at the prima facie stage," Woodman, 411 F.3d at 80 n.11, but the panel also recognized that "the law does not equate 'knowledge' with certitude, nor does it demand direct proof of knowledge. A jury may reasonably infer a defendant's knowledge from the totality of circumstantial evidence, and conscious avoidance of a highly probable fact can, in some cases, satisfy the knowledge requirement." Id. at 77 n.8.

Fieldston does not dispute or otherwise challenge Ms. Gamble's testimony that numerous employees, including Ms. Tirado, whose office is next to Administrator Knoll's and with whom he spoke frequently, knew that Plaintiff is gay.  Nor does Fieldston contest Plaintiff's testimony that her engagement video circulated widely at the facility and was the subject of conversation among many Fieldston employees.  Indeed, because "a party's knowledge of a disputed fact may also be proved though evidence that he consciously avoided knowledge of what would otherwise have been obvious him," a jury could determine that Administrator Knoll acted knowingly when he avoided direct knowledge of the "high probability" that Ms. Gamble is gay.  Id. at 84 n.14.  Therefore, Plaintiff has easily met her burden under the prima facie stage "to adduce some evidence of knowledge to support an inference of intentional discrimination." Id. at 80 n.11.

Moving on to the second step of the burden-shifting framework, Fieldston claims that it terminated Ms. Gamble's employment because of the lack of available work.  A business consideration that causes an employer to eliminate one or more positions within a company is

sufficient to establish a legitimate, non-discriminatory reason for the plaintiff's termination.  See, e.g., Smith v. F.W. Morse & Co., 901 F. Supp. 40 (D.N.H. 1995), aff'd, 76 F.3d 413 (1st Cir. 1996).

The burden now shifts to Plaintiff to show that Fieldston's allegedly legitimate reason was, in fact, a pretext for discrimination.  To defeat summary judgment at this stage, "a plaintiff need only show that the defendant was in fact motivated at least in part by the prohibited discriminatory animus."  Henry v. Wyeth Pharm., Inc., 616 F.3d 134, 156 (2d Cir. 2010). Fieldston reiterates its argument that Plaintiff cannot defeat summary judgment because she has failed to show that Administrator Knoll knew of her sexual orientation.  That argument is unavailing for the same reasons described above.  See, e.g., Mumma v. Pathway Vet All., LLC, No. 20-CV-00926-TOF, 2023 WL 34666, at *10 (D. Conn. Jan. 4, 2023) ("Pretext may be demonstrated either by the presentation of additional evidence showing that 'the employer's proffered explanation is unworthy of credence' . . . or by reliance on the evidence comprising the prima facie case, without more[.]") (quoting Chambers v. TRM Copy Ctrs. Corp., 43 F.3d 29, 38 (2d Cir. 1994)).

Based on Plaintiff's testimony regarding the circulation of the engagement video at Fieldston, and the close physical proximity of Ms. Tirado's and Administrator Knoll's offices, as well as their allegedly frequent conversations during work hours, the Court concludes that there are genuine disputes of material fact as to Administrator Knoll's knowledge of Ms. Gamble's sexual orientation, and therefore, on the issue of pretext, those disputes preclude summary judgment.  Moreover, Plaintiff's testimony that Administrator Knoll, after regularly speaking with her on Fridays, largely ignored her following the video's revelation, and that she had previously witnessed him and other Fieldston employees making fun of an employee believed to be homosexual, likewise introduces issues of material fact as to the substance and

basis of Fieldston's work-related explanation for termination. To be sure, the trier of fact would be free to credit Administrator Knoll's sworn denials, but that is not a matter for the Court to decide on summary judgment. Therefore, the Court denies Defendant's motion for summary judgment on the Title VII sexual orientation discrimination claim.[3]

Title VII Retaliation

A claim for retaliation is analyzed under the same three-part McDonnell Douglas burden shifting test, but the elements of the prima facie case for retaliation differ slightly from those for discrimination. To establish a prima facie case of retaliation, a plaintiff must demonstrate that: (i) she was engaged in protected activity; (ii) the alleged retaliator knew that she was involved in protected activity; (iii) an adverse decision or course of action was taken against her; and (iv) a causal connection exists between the protected activity and the adverse

---

[3] To the extent Ms. Gamble continues to claim that her termination also operated as a "retraction" of the oral offers for the Staffing Coordinator position, the Court concludes that that issue is not properly presented as an independent basis for a discrimination claim. (See docket entry no. 50 ("Pl. Opp.") at 16-17.) Plaintiff's entire legal argument that the alleged "retraction" serves as a recognized adverse employment action is limited to one sentence and citations to case law that discuss a failure to promote claim. (See id.) Although it is true that a failure to promote can in and of itself qualify as an adverse employment action under Title VII, Plaintiff neglects to acknowledge, let alone address the test for that particular claim. See, e.g., Martinez v. Davis Polk & Wardwell LLP, 208 F. Supp. 3d 480, 485 (E.D.N.Y. 2016), aff'd, 713 F. App'x 53 (2d Cir. 2017) (citation omitted) (noting that a prima facie case for a failure-to-promote claim requires plaintiff to show that "1) he is a member of a protected class; 2) he applied for promotion to a position for which he was qualified; 3) he was rejected for the position; and 4) the employer kept the position open and continued to seek applicants"); see also id. at 486 (noting that the application requirement is excused where "(1) the vacancy at issue was not posted, and (2) the employee either had (a) no knowledge of the vacancy before it was filled or (b) attempted to apply for it through informal procedures endorsed by the employer") (citation omitted). Plaintiff fails to tackle these elements at all and, more importantly, cites no authority to support her theory that a termination, absent any independent failure to promote, can satisfy a failure to promote claim. (See Pl. Opp. at 16-17.) In any event, the Court concludes that Plaintiff cannot proceed on a failure to promote theory because there are no facts in the record indicating that she applied for the Staffing Coordinator position, and her failure to do so cannot be excused, because Fieldston posted a public job advertisement, and later hired an external candidate.

action." Natofsky v. City of New York, 921 F.3d 337, 353 (2d Cir. 2019) (citation omitted). "A causal connection in retaliation claims can be shown either (1) indirectly, by showing that the protected activity was followed closely by discriminatory treatment, or through other circumstantial evidence such as disparate treatment of fellow employees who engaged in similar conduct; or (2) directly, through evidence of retaliatory animus directed against the plaintiff by the defendant." Id. (citation and internal quotation marks omitted). However shown, the connection must be such that "discrimination was the but-for cause of any adverse employment action." Id. at 348.

If a prima facie case is established, a presumption of retaliation arises. "The defendant must then articulate a non-retaliatory reason for the adverse employment action." Hicks v. Baines, 593 F.3d 159, 164 (2d Cir. 2010) (internal quotation marks and citation omitted). If such a reason is articulated, "the presumption of retaliation dissipates," id., and the employee "must show that retaliation was a 'but-for' cause of the adverse action, and not simply a 'substantial' or 'motivating' factor in the employer's decision." Zann Kwan v. Andalex Group LLC, 737 F.3d 834, 845 (2d Cir. 2013) (citing Univ. of Tex. Sw. Med. Ctr. V. Nassar, 570 U.S. 338, 362 (2013)). "However, 'but-for' causation does not require proof that retaliation was the only cause of the employer's action, but only that the adverse action would not have occurred in the absence of the retaliatory motive." Id. at 846. "It is not enough that retaliation was a 'substantial' or 'motivating' factor in the employer's decision." Vega v. Hempstead Union Free Sch. Dist., 801 F.3d 72, 90-91 (2d Cir. 2015) (citation omitted). A plaintiff can prove that the desire to retaliate was the but-for cause of the challenged employment action "by demonstrating weaknesses, implausibilities, inconsistencies, or contradictions in the employer's proffered legitimate, nonretaliatory reasons for its action." Zann Kwan, 737 F.3d at 846.

Fieldston challenges Plaintiff's retaliation claim on the first two elements of her prima facie case: (1) that she has failed to show that her complaints regarding her colleagues' conduct and comments constituted "protected activity," and (2) that she has failed, as with her discrimination claim, to show that Administrator Knoll knew about her complaints. (Def. Mem. at 18-20.) The Court addresses each argument in turn.

To qualify as protected activity, an employee "need not prove that her underlying complaint of discrimination had merit," Lore v. City of Syracuse, 670 F.3d 127, 157 (2d Cir.2012), but only that she had a "good faith, reasonable belief that the underlying challenged actions of the employer violated [Title VII]." See Gregory v. Daly, 243 F.3d 687, 701 (2d Cir. 2001); McMenemy v. City of Rochester, 241 F.3d 279, 285 (2d Cir. 2001). "The reasonableness of the plaintiff's belief is to be assessed in light of the totality of the circumstances." Kelly v. Howard I. Shapiro & Assocs. Consulting Engineers, P.C., 716 F.3d 10, 114-5 (2d Cir. 2013) (citation omitted). Fieldston dismisses Plaintiff's complaints because it argues that she did not assert that she was subject to "discrimination" or that anyone in Fieldston was engaging in unlawful activity. (See docket entry 55 ("Def. Reply") at 11.) But the law does not require that plaintiff use the word "discrimination," and plaintiff's complaints may qualify as protected activity even if the complained-of conduct is not independently unlawful. Lore, 670 F.3d at 157. Moreover, Defendant incorrectly relies on case law discussing a hostile work environment claim, which applies a substantively different standard to employee conduct and comments that must be "severe or pervasive." (Def. Mem. at 19.)

Here, considering the totality of the circumstances, Plaintiff has shown that her complaints were motivated by a good faith, subjective belief that her colleagues' conduct was unlawful under Title VII. Among other things, her testimony indicates that she approached Ms. Tirado and Ms. Zamudio in the hope that they would take some action to rectify what she

perceived as wrongful, discriminatory treatment on the basis of her sexuality, including by "in-servic[ing] [staff] on how to treat people." (Pl. Dep. Tr. 136:5-10.) Despite Ms. Tirado's admonition that she not "worry about these mother fu[**]ers in the facility," Plaintiff continued to visit Ms. Tirado regularly and continued to express her discontent with her colleagues' conduct, which not only included comments questioning her sexual orientation, but also a refusal to speak to or otherwise engage with her in the workplace. (Id. 132:21-133:9, 135:5-6.) The Court finds that Plaintiff's testimony is more than sufficient to establish that she possessed the requisite good faith, subjective belief in making her complaints, and that her complaints properly constitute protected activity under the law.

As to Fieldston's second challenge, based on Administrator Knoll's professed lack of knowledge about Plaintiff's complaints, the Court notes that "a plaintiff may rely on 'general corporate knowledge' of her protected activity to establish the knowledge prong of the prima facie case." Zann Kwan, 737 F.3d at 844. Therefore, at least at the prima facie stage, Defendant's challenge is without merit for the simple reason that Plaintiff complained to Ms. Tirado and Ms. Zamudio, who are "officer[s] of the corporation." Id.; see also Henry v. Wyeth Pharm., Inc., 616 F.3d 134, 148 (2d Cir. 2010) (quoting Gordon v. N.Y.C. Bd. of Educ., 232 F.3d 111, 117 (2d Cir. 2000) ("[A] jury may 'find retaliation even if the agent denies direct knowledge of a plaintiff's protected activities, for example, so long as the jury finds that the circumstances evidence knowledge of the protected activities[.]'"); Dall v. St. Catherine of Siena Med. Ctr., 966 F. Supp. 2d 167, 194 (E.D.N.Y. 2013) ("It is not necessary that Plaintiff prove that the specific actors knew of the protected activity as long as Plaintiff can demonstrate general corporate knowledge." (citations omitted)).

As the Plaintiff has established her prima facie case for retaliation, at the second step of the burden-shifting framework, Fieldston again cites the lack of available work as its

legitimate, non-retaliatory reason for eliminating Plaintiff's position. That brings us to the final step of the framework, in which Plaintiff must rebut Fieldston's proffered reason. The Second Circuit has explained that, "[a]lthough temporal proximity alone is insufficient to rebut the employer's nondiscriminatory reason for the adverse employment action, temporal proximity combined with other evidence such as inconsistent employer explanations may defeat summary judgment. Zann Kwan, 737 F.3d at 847. Plaintiff's testimony is that she complained, at least to Ms. Tirado, regularly following the disclosure of the engagement video in late May up until her termination in mid-to-late August. (Pl. Dep. Tr. 133:10-20.)   That suffices to establish temporal proximity. In addition, as with her discrimination claim, Plaintiff cites the close physical proximity of Ms. Tirado's and Administrator Knoll's offices, as well as their frequent conversations during work hours, in aid of her claim that Administrator Knoll not only knew about her complaints but also acted with the requisite retaliatory animus when he decided to terminate her employment at Fieldston. In response, Administrator Knoll proffers that he was not aware of any complaints Plaintiff made regarding the "behavior of other employees," and that neither Plaintiff nor Ms. Tirado brought them to his attention. (Knoll Second Decl. ¶ 6.) There is a genuine issue of material fact as to Administrator Knoll's knowledge of Plaintiff's protected activity.

Furthermore, "a plaintiff may prove that retaliation was a but-for cause of an adverse employment action by demonstrating weaknesses, implausibilities, inconsistencies, or contradictions in the employer's proffered legitimate, nonretaliatory reasons for its action." Zann Kwan, 737 F.3d at 846. "From such discrepancies, a reasonable juror could conclude that the explanations were a pretext for a prohibited action." Id. Here, Ms. Gamble points to a "check summary" which indicates that her weekly pay—based on hours worked—remained relatively consistent throughout all of 2019 leading up to her termination in August. (See Check

Summary at 1.)  Fieldston does not address that document, and instead relies on Administrator Knoll's statement in his declaration that the available work for Ms. Gamble continued to decline in 2019.  (Knoll First Decl. ¶¶ 17-18.)  The Court thus concludes that Plaintiff has raised genuine issues of material fact as to the substance and basis of Fieldston's work-related, non-retaliatory reason for her termination, in light of her testimony that she had "plenty of work left on [her] desk" the day that she was terminated, and the documentary evidence indicating that her hours did not materially decline in the months before her termination.  (Pl. Dep. Tr. 160:19-25.)  Therefore, the Court denies Defendant's motion for summary judgment on the Title VII retaliation discrimination claim.

## CONCLUSION

For the foregoing reasons, Fieldston's motion for summary for judgment is denied in its entirety.  This Memorandum Order resolves docket entry no. 42.

The Court will refer the parties to the Mediation Program for settlement purposes by separate order.  The final pretrial conference in this case is hereby scheduled for December 15, 2023, at 10:30 a.m. in Courtroom 17C.  The parties must confer and make submissions in advance of the conference in accordance with the Pretrial Scheduling Order that will be filed contemporaneously with this Memorandum Order.

SO ORDERED.

Dated: September 30, 2023  
  New York, New York

/s/ Laura Taylor Swain  
LAURA TAYLOR SWAIN  
Chief United States District Judge